Filed 5/2/13  P. v. Holman CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVION DIANTA HOLMAN,<br><br>    Defendant and Appellant. | B244938<br><br>(Los Angeles County<br>Super. Ct. No. TA116061) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Cheroske, Judge.  Affirmed.

California Appellate Project, Jonathan B. Steiner and Richard B. Lennon, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Davion Dianta Holman, appeals from the judgment entered following his pleas of no contest to one count of second degree robbery (Pen. Code, § 211)[1] (count 1) and three counts of first degree robbery (§ 211) (counts 2, 3 and 4) and his admissions with regard to count 1 that he personally used a firearm, a handgun (§ 12022.53, subd. (b)) and that the offense was committed for the benefit of, at the direction of and in association with and the specific intent to promote, further and assist a criminal street gang (§ 186.22, subd. (b)(1)(C)). The trial court sentenced Holman to 31 years in prison. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*[2]

At approximately 10:50 p.m. on January 2, 2011, Theresa Arnold and her husband, Daniel Green, were at their home located at 8759 McKinley Place in Los Angeles. Arnold's godson, James Thomas, and a friend, William Louis, had been visiting and were just about to leave.

Green opened the door and, followed by Arnold, stepped out onto the front porch. As they did so, a "young man came from the side of the house" and approached Green. The two men started wrestling and the man pulled out from under his coat a large gun. The gun was bigger than a handgun, "it was like a tech nine" and was approximately 18 inches long. Green fought with the man, wrestling with him until the gun was "pointing up in the air." As Green was struggling with the man, a second man, Holman, came onto the porch and hit Green on the side of the head with a silver handgun, causing Green's head to bleed. Holman then asked Green "if [he] was stupid." Holman indicated that Green should have known he could not fight someone who had a gun.

Arnold and Green somehow managed to make it back inside their house. However, as they attempted to close the door, the attacker with the larger weapon put his

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The facts have been taken from the transcript of the preliminary hearing.

hand, in which he was holding the gun, inside, between the door and the wall. Green and Arnold, in an attempt to keep the men from entering the house, pushed on the door but the man with his arm inside the house managed to hit Green on the head, causing him to stumble. As Arnold could not hold the door closed by herself, Holman and his cohort "pushed their way in." Once inside, Holman and his accomplice began to beat Green. During the altercation, Holman hit Green on the lip and the left side of his head with a gun, again cutting Green and causing him to bleed. After they had finished with Green, the men told everyone to " 'get down on the floor.' " Green, Thomas and Arnold complied with the order and got down onto the floor, face down. Louis, however, managed to hide behind the television.

Holman and his accomplice hit Thomas on the face and kicked Arnold in her side. Holman then began to "tape [everyone] up." As he "taped up" Green, Holman told him to keep his face down. He said to Green, " 'Don't look at my face, sir, or I'll kill you.' "

Holman moved on to Arnold and told her to remove her jewelry. However, when Arnold indicated that she could not do so because she was too nervous and frightened, Holman and his accomplice simply told her to "hurry [up] and take it off or [they would shoot her]." When Arnold still could not comply with their demands, her godson, Thomas, took her jewelry off for her. When Thomas had finished, Holman picked up the jewelry. One of the men told Thomas not to look up at them and that if he looked at their faces, they would kill him. The men then told Thomas to remove all the money from his pockets. He did so and handed it to Holman. Some of Arnold's money was lying on the floor and Holman picked that up as well.

While Holman was collecting money and jewelry from Arnold and Thomas, his accomplice was "getting [Green's] stuff." After Holman's cohort took Green's money, watch and jewelry, the two men had Green, Arnold and Thomas "crawl" across the floor until they were all in front of the television. As he was lying on the ground, one of the intruders held his gun against Green's left temple and asked him, " 'Where is the thing at?' " Green, who did not know what the man was talking about, answered, " 'What thing?' " The men, who had kicked Green in the ribs and face, then walked away.

As she was lying on the living room floor, Arnold saw and heard Holman speak to someone on a cell phone. Arnold heard the person to whom Holman was speaking tell him to "hurry up and come out [of] the house because the cop[s] [were] on their way." Holman responded by stating that he was "going to take his time, [that] he didn't care." Arnold noted, however, that during the robbery, Holman was doing what "the other guy with the big gun [told him] to do."

Throughout the incident, including when he was on the phone, Holman stood over Arnold, Green and Thomas, aiming his gun in their direction. As he did so, his accomplice went through the house searching for jewelry and whatever else of value he could find. He took a "couple of watch[es]" and a sword from Arnold's son's sword collection. One of the robbers then approached Green, "slap[ped]" him in the face with the sword and told him that if he did not tell the robber where the valuables were kept, the robber would " 'make [Green's] wife watch [the robber] cut [Green's] balls out and [his] legs off.' "

At some point, Holman "pushed a rag in [Arnold's] mouth" and, because she could not breath, she suffered an epileptic seizure. Green told Holman that, as she was unable to take her medication, Arnold would suffer from "convulsions."

While both Holman and his accomplice were still inside the house, police officers arrived. Both men asked Green how to get out. Holman then asked Green where he could hide. Green told Holman that the only entrance to the house was "right through that door." Holman responded by stating that "if the cops c[a]me, he [was] going to start shooting . . . ." However, before Holman could make it out of the dining area, officers "kicked [in] the [front] door" and took him into custody. Later that night, Arnold identified Holman as one of the men who had come into her home with a gun and attacked her.

When police later interviewed Green, he told them that Holman had both pointed his gun at Green and hit him with it. Green also told police that he thought the man with the larger gun was "the leader" of the two and that the man had been telling Holman what to do.

4

Los Angeles Police Officer James Moon works in the southwest division's gang enforcement detail.[3] Although Moon did not know Holman, he was advised by the detective who had booked Holman on the night of January 2, 2011 that he had given as his moniker " 'D Money' " and had provided the detective with a copy of his "Facebook" page. On his Facebook page, Holman had listed as one of his "favorites," "HK," which stands for " 'Hoover Killer.' " According to Moon, the Hoovers are a "common enemy of the Rolling 40's." Among his activities, Holman had listed "gang-banging" and "Rolling 40's." As one of his friends, Holman had listed a man by the name of D'nary Fowler. Officer Moon had known Fowler for approximately four years. Fowler was a "known, active gang[] member within the Rolling 40's." He had "self-admitted" to Moon on several occasions that he was a gang member and he had gang tattoos.[4] With regard to Holman, Moon was of the opinion, based on the information provided to him, that Holman was a member of the Rolling 40's gang.

Officer Moon was also of the opinion that the crimes committed on the night of January 2, 2011 were for the benefit of, at the direction of and in association with a criminal street gang. Fowler was a known gang member with visible gang tattoos on his neck. As is common in gang-related crimes, Fowler and Holman were working with a third person, a lookout or "getaway" driver with whom they spoke on a cell phone. In addition, Fowler was giving orders to Holman. It is "common for individuals who have been in the gang longer . . . or [are] higher in the gang [hierarchy] to call the shots, to give orders to younger gang members, . . . to show them . . . what they call putting in work, which is committing crimes." Moreover, commission of a crime such as this one benefits the gang by instilling fear of the gang into the victims. It also raises the status of

---

[3] It was stipulated for purposes of the preliminary hearing that Moon qualified as an expert "as to the habits and customs of gangs, . . . specifically with the Rolling 40's gang as he ha[d] worked that gang and ha[d] testified [approximately 30 times] as an expert" with regard to that gang.

[4] Fowler was the individual who, with Holman, had entered Green's and Arnold's home on the night of January 2, 2011. Fowler "is now deceased."

5

the individual gang members because it shows they are willing to "put[] in work for the gang; . . . they're . . . committing crimes for the gang itself." It was Moon's opinion that, judging from his Facebook page, Holman was not just generally "gangbanging." He was putting in work for the Rolling 40's.

It was stipulated for purposes of the preliminary hearing that a Detective Vahar had "downloaded" and printed Holman's Facebook page, then conducted an interview with Holman. After being "*Mirandized*,"[5] Holman had indicated that the getaway driver in this incident was an individual called "Boogie Man" and that the "co-suspect in this case [went] by the name of D'nary Fowler and . . . [was] the individual who has been referred to as the deceased or the man who got shot."

    2. *Procedural history.*

After the testimony at the preliminary hearing, Holman's counsel asserted that there was insufficient evidence to support the gang allegations and moved that they be stricken from the charges. The trial court denied the motion and indicated that it appeared to the court that the alleged robberies had been committed for the benefit of, in association with and at the direction of a criminal street gang.

On March 8, 2011, an information was filed charging Holman with four counts of "home invasion robbery" in violation of section 211, a felony (counts 1 to 4). It was alleged as to each count that the crime was a violent felony (§ 667.5, subd. (c)), a serious felony (§ 1192.7, subd. (c)), and was of the first degree in that it had been committed in concert with two or more other persons within an inhabited dwelling house (§ 213, subd. (a)(1)(A)). It was further alleged with regard to all four counts of robbery that Holman personally used a firearm, a handgun, within the meaning of section 12022.53, subdivision (b), and that the offenses were committed for the benefit of, at the direction of and in association with a criminal street gang, causing the sentencing to be imposed pursuant to section 186.22, subdivision (b)(4).

---

[5]    See *Miranda v. Arizona* (1966) 384 U.S. 436.

At arraignment held on March 8, 2011, Holman entered pleas of not guilty to each count and denied each of the special allegations.

On July 28, 2011, the district attorney indicated that an agreement had been reached. The robbery alleged in count 1 was to be reduced to a second degree crime. Counts 2, 3 and 4 would remain first degree robberies. Holman was to plead guilty or no contest to each count, but admit the gang and gun-use allegations only with regard to count 1. In addition, the gang allegation was to be reduced from one alleged pursuant to section 186.22, subdivision (b)(4), to one alleged pursuant to section 186.22, subdivision (b)(1)(C).[6] In exchange for his plea, the trial court would sentence Holman to 31 years in prison.[7]

After waiving his right to a jury trial, his right to present a defense by using the subpoena power of the court to bring in his own witnesses, his right to confront and cross-examine each of the witnesses who testified against him and his right to remain silent, Holman pleaded no contest to second degree robbery, a felony in violation of section 211 as alleged in count 1 of the information. He then admitted that he had committed the offense "at the direction of a criminal street gang" in violation of section 186.22, subdivision (b)(1)(C) and that he had been personally armed with a firearm during the crime pursuant to section 12022.53, subdivision (b). With regard to counts 2, 3 and 4, which alleged Holman had committed first degree "home invasion" robbery in violation of section 211, he entered pleas of no contest as to each count. The trial court then found that Holman had understood "the nature of [the] charges, the consequences of his pleas, his constitutional rights" and had made "a knowing, intelligent waiver of his

---

[6] A gang allegation made pursuant to section 186.22, subdivision (b)(4) provides for an enhancement consisting of an indeterminate term of life in prison. A gang allegation made pursuant to section 186.22, subdivision (b)(1)(C) provides for an enhancement of 10 years in prison.

[7] Were Holman to have gone to trial in this matter, he would have faced a theoretical maximum sentence of life in prison.

7

rights."  The court found Holman guilty of the charges and allegations based on "his plea[s] of no contest" and his admissions.

Holman waived arraignment for sentencing and the trial court imposed the agreed upon term of five years in prison for his conviction of second degree robbery as alleged in count 1.  For his admissions that he had committed the crime for the benefit of a criminal street gang and had been armed with a firearm during the offense, the trial court imposed consecutive terms of 10 years for each allegation.  Accordingly, as to count 1 Holman was sentenced to a total term of 25 years in prison.  For the first degree robberies alleged in counts 2, 3 and 4, the trial court imposed consecutive terms of one-third the midterm, or two years for each count.  In total, Holman was sentenced to 31 years in state prison.  The trial court awarded Holman presentence custody credit for 207 days actually served and 31 days of good time/work time, for a total of 238 days.

The trial court ordered Holman to pay a $10,000 restitution fine (§ 1202.4, subd. (b)), a stayed $10,000 parole revocation restitution fine (§ 1202.45), a $20 DNA fee, a $120 court construction fee and a $160 court security fee (§ 1465.8, subd. (a)(1)).  It then dismissed all remaining allegations and ordered Holman transferred to state prison forthwith.

Holman filed a timely notice of appeal and request for a certificate of probable cause on September 21, 2011.  In his request for a certificate of probable cause, Holman asserted that his plea had been unlawful because he was not a gang member and had only admitted that he was in order to avoid a life sentence.  On November 1, 2012, the trial court denied Holman's request for a certificate of probable cause.

In an order filed November 14, 2012, the administrative presiding justice of this court issued an order indicating that "[i]n light of the denial of the request for certificate of probable cause, the appeal filed on September 21, 2011, is limited to non-certificate issues."

## CONTENTIONS

After examination of the record, counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record.

8

By notice filed January 18, 2013, the clerk of this court advised Holman to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S.259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


CROSKEY, J.